# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

TIMOTHY J. ESTES,                                        Case No. 1:11-cv-496

            Plaintiff,                                   Dlott, J.
                                                         Bowman, M.J.

        v.


MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

            Defendant.


## REPORT AND RECOMMENDATION

Plaintiff Timothy J. Estes filed this Social Security appeal in order to challenge the

Defendant's finding that he is not disabled. *See* 42 U.S.C. §405(g). Proceeding *pro se*,

Plaintiff has filed a "statement of errors" that contains a loosely organized list of evidence

that he contends was not properly considered by the Commissioner. Plaintiff seeks an

award of disability benefits by this Court. Construing Plaintiff's claims liberally, he

alternatively seeks remand for further review under sentence four, and or remand for

consideration of new evidence under sentence six.[1] As explained in Section II. C below,

I conclude that the ALJ's finding of non-disability should be REVERSED and REMANDED

for further fact-finding under sentence four, because it is not supported by substantial

evidence in the administrative record. However, I conclude that a sentence six remand is

---

[1] A sentence four remand under 42 U.S.C. §405(g) provides the required relief in cases where there is insufficient evidence in the record to support the Commissioner's conclusions and further fact-finding is necessary. *See Faucher v. Secretary of Health and Human Servs.,* 17 F.3d 171, 174 (6th Cir. 1994) (citations omitted). This Court may consider the new evidence submitted by Plaintiff only for purposes of a requested sentence six remand, not for purposes of evaluating whether substantial evidence existed for the Defendant's previous denial of benefits. *Cotton v. Sullivan,* 2 F.3d 692, 696 (6th Cir. 1993).

unnecessary.

## I. Summary of Administrative Record

In May 2007, Plaintiff filed applications for both disability insurance benefits ("DIB") and for supplemental security income ("SSI"), alleging a disability onset date of November 2, 2006.[2] Plaintiff's claims were denied initially and upon reconsideration, and Plaintiff thereafter requested a hearing *de novo* before an Administrative Law Judge ("ALJ"). Plaintiff appeared without counsel and testified at an initial hearing held on February 3, 2010, at which a vocational expert also appeared and testified. Following that first hearing, ALJ Thomas R. McNichols II sent Plaintiff for an independent medical examination by an orthopedic specialist (Tr. 70), thereafter convening a second hearing in Dayton, Ohio on June 21, 2010. At the latter evidentiary hearing, at which Plaintiff also testified, Plaintiff was represented by counsel. In addition to Plaintiff's testimony, the ALJ heard testimony from William Newman, M.D., a board certified orthopedist and medical expert, and from Eric W. Pruitt, a second vocational expert. On July 19, 2010, the ALJ denied Plaintiff's applications in a written decision. (Tr. 6-29).

The record on which the ALJ's decision was based reflects that Plaintiff was 45 years old at the time of the onset date of his alleged disability, and has a high school education.[3] (Tr. 27). Plaintiff has spent most of his adult life as an iron-worker, classified as a structural steel worker at the heavy, skilled level. (Tr. 67). Plaintiff has worked part-time on a limited basis, but has not engaged in substantial gainful activity since November 2, 2006. (Tr. 11).

_____

[2] Plaintiff states in a document captioned as an "Answer" to Defendant's response that he "will accept April of 2007 as date of dissability [sic]." (Doc. 24 at 4).

[3] Plaintiff testified that he dropped out of school after the eleventh grade, but that he subsequently earned his G.E.D. (Tr. 76).

Based upon the record and testimony presented, the ALJ found that Plaintiff had the following severe impairments: "degenerative changes of the cervical and thoracic spines and a lumbar disc protrusion with neck and back pain; a left rotator cuff tear with chronic left shoulder pain; and a history of mood and pain disorders." (Tr. 11). The ALJ concluded that none of Plaintiff's impairments alone or in combination met or medically equaled a listed impairment in 20 C.F.R. Part 404, Subp. P, Appendix 1. (Tr. 14). The ALJ determined that Plaintiff retains the residual functional capacity ("RFC") to perform a limited range of light work as follows:

> He can stand and/or walk no more than four hours in an eight-hour day. He can never climb stairs, ropes, ladders, or scaffolds; he can only occasionally balance, stoop, kneel, crouch, crawl, or use foot controls; and he can perform handling or gross manipulation no more than frequently. He can push and/or pull no more than occasionally on the left and no more than frequently on the right, and he can perform no work above shoulder level on the left, although he can do so frequently on the right. He can tolerate no more than occasional exposure to hazards and vibrations. His work must be limited to simple, one- or two-step tasks requiring little, if any, concentration and no exposure to the general public.

(Tr. 15).

The vocational expert at the second hearing testified that although Plaintiff could not perform his prior work as an iron-worker, he would still be able to perform the requirements of 4,000 unskilled light jobs, such as small parts assembler, textile inspector, and mail clerk, and 2,400 unskilled sedentary jobs, including automatic grinding machine operator, final assembler, and clip loading machine loader. (Tr. 107-109). Upon questioning from Plaintiff's counsel as to whether Plaintiff could perform those jobs if he could lift any amount of weight only occasionally, the vocational expert testified that a person with those

limitations could still perform 800 sedentary jobs in the region. (Tr. 112-113). Based upon this testimony and given Plaintiff's age, education, work experience, and RFC, the ALJ concluded that, although he could not perform his prior work, "there are jobs that exist in significant numbers in the national economy that the claimant can perform." (Tr. 27). Accordingly, the ALJ determined that Plaintiff was not under disability, as defined in the Social Security Regulations, and was not entitled to DIB or to SSI. (Tr. 28).

The Appeals Council denied Plaintiff's request for review. Therefore, the ALJ's decision stands as the Defendant's final determination. Mindful of Plaintiff's *pro se* status, the Court liberally construes Plaintiff's claims as asserting that the ALJ erred by: (1) accepting the testimony of the medical expert; (2) failing to find additional hand or elbow limitations; (3) failing to find additional back or shoulder impairment due to pain; (4) failing to find additional mental impairments; (5) rejecting the opinions of treating physicians; (6) failing to find a Listed impairment; and (7) misconstruing vocational expert testimony.

In favor of additional review, Plaintiff seeks to have this Court (and the Commissioner) consider "new" evidence under Sentence Six: (1) a letter dated May 20, 2011 from ODAR to Ms. Jean Schmidt; (2) a work activity abilities assessment dated 10/13/11 by his new doctor, Madhu Kasaraju; and (3) new CT scans "that indicate the cervical spine and lumbar spine have worsened." (Doc. 18 at 9).

As discussed below, the Court finds no error requiring reversal or remand in any seven of the eight claims specifically identified by Plaintiff. However, one of Plaintiff's claims has merit, and in the course of reviewing that claim, the Court discovered additional errors that require remand for further review by the ALJ.

## II. Analysis

### A. Judicial Standard of Review

To be eligible for benefits, a claimant must be under a "disability" within the definition of the Social Security Act. *See* 42 U.S.C. §1382c(a). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986).

When a court is asked to review the Commissioner's denial of benefits, the court's first inquiry is to determine whether the ALJ's non-disability finding is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (additional citation and internal quotation omitted). In conducting this review, the court should consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359, 362 (6th Cir. 1978). If substantial evidence supports the ALJ's denial of benefits, then that finding must be affirmed, even if substantial evidence also exists in the record to support a finding of disability. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). As the Sixth Circuit has explained:

> The Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. . .. The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.

*Id.* (citations omitted).

In considering an application for supplemental security income or disability benefits, the Social Security Agency is guided by the following sequential benefits analysis: at Step 1, the Commissioner asks if the claimant is still performing substantial gainful activity; at Step 2, the Commissioner determines if one or more of the claimant's impairments are "severe;" at Step 3, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; at Step 4, the Commissioner determines whether or not the claimant can still perform his or her past relevant work; and finally, at Step 5, if it is established that claimant can no longer perform his past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Commissioner of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920.

## B. Plaintiff's Claims of Error

Six of the first seven assertions of error identified by Plaintiff and construed by this Court do not require remand. In addition, the Court finds no cause to remand under Plaintiff's eight claim, seeking consideration of new evidence under sentence six. Section B of this Report and Recommendation discusses these rejected claims of error. Following that discussion, in Section C, I will discuss the error partially identified by Plaintiff and related errors discovered by this Court that form the basis for the recommendation that this case be remanded under sentence four, for further factual development.

## 1. Acceptance of Medical Expert Testimony

In his "Statement of Errors," and in several additional documents filed of record, Plaintiff complains vigorously that the ALJ erred in accepting and relying upon the testimony

of medical expert, Dr. William Newman. One of Plaintiff's chief complaints is that Dr. Newman's testimony should not have been admitted or accepted, because Dr. Newman admitted that he was unable to read some of the medical evidence.

Plaintiff additionally claims that Dr. Newman testified that he needed new glasses and that the glasses he was wearing were 12 to 15 years old. However, notwithstanding Plaintiff's reference to Dr. Newman's "testimony" at "Page 98 - at approximately this page and 5th line," (Doc. 18 at 1), no such testimony of Dr. Newman exists in the administrative record or in the transcript of the evidentiary hearing filed in this Court. In fact, Plaintiff acknowledges that the alleged "testimony" does not appear in the record. Insisting that the testimony should be added to the record, Plaintiff has filed a "Request for Addendum to Defendant's answer," in which he states that "there seems to be missing transcript of Dr. Newman's testimony regarding his glasses and ability...to read a faxed copy of the evidence." (Doc. 19 at 1, punctuation and capitalization corrected).

In another document captioned as a "Request for Audio and Visual record of both hearings," Plaintiff seeks both an "addendum" of Dr. Newman's testimony, and the addition of recorded copies of the two hearings to the record of this Court on grounds that an audio and visual recording of those hearings will undermine another finding by the ALJ- that Plaintiff sat throughout the hearing and did not appear to be in pain or any distress. (Doc. Doc. 26). According to Plaintiff, he stood through part of the February hearing and during the second hearing in June 2010, his attorney "asked me if I was ok because I was confused and disoriented." (*Id.*, capitalization corrected).

Plaintiff also has filed a separate "motion for contempt and dismissal of Defendant's Answer" (Doc. 25) on grounds that Defendant improperly paraphrased Dr. Newman's

testimony as describing a chart as "*difficult* to read" when in fact Dr. Newman testified that the referenced portion of the chart contained "writing...so small *I can't read it.*" (Doc. 25 at 1, emphasis added). Plaintiff argues that Defendant has misrepresented Dr. Newman's testimony to this Court, and should be held in contempt of Court as a result.

The Court declines to "add" to Dr. Newman's testimony, and will deny Plaintiff's various motions to supplement the administrative record with either "audio and visual recordings" of the two evidentiary hearings, or with the alleged "missing" testimony that Plaintiff alleges that Dr. Newman provided concerning the age of his glasses.[4] In order to resolve the issues concerning Dr. Newman's testimony, the Court finds it helpful to review that testimony in the context in which it was given. At the second evidentiary hearing, Plaintiff's counsel questioned Dr. Newman about one exhibit in particular, concerning alleged impairments caused by Plaintiff's carpal tunnel syndrome:

> Q. All right. And that same doctor that interpreted that EMG in 45F also indicates that, in her opinion, this gentleman does have carpal tunnel syndrome of a moderate to severe degree, isn't that true?
>
> A. She said he had carpal tunnel syndrome but she didn't describe the latency, degree of latency in the body of the report. Usually when they do an EMG there's a chart showing spontaneous electrical activity. She didn't describe any latencies and she didn't describe any spontaneous electrical activity.
>
> Q. Okay.
>
> A. So without that, you can't say that there's a significant impairment functionally...
> ........

---

[4] Dr. Newman testified on cross-examination by counsel that he is 85 years of age, that he has been employed on a part-time basis for the past 10 years, that he was last recertified in orthopedic surgery in 1983, that he still sees patients but has a limited practice that includes putting on casts and removing them, and that he averages approximately four to five social security hearings per week in terms of testifying for the Social Security Administration as a medical expert. (Tr. 100-102).

Q.  What about page three?

A.  –there's usually a chart that shows you the latencies and the degrees of fibrillations --

Q.  Right.
A.  – or positive waves.  And this thing, this report doesn't show any of that.

Q.  Okay.  Would you look at 45F, pages three and pages five.
.............
Q.  Pages three and page five of Exhibit 45F, isn't that the chart that shows the latencies and the lack thereof, and the decreased response of the nerves across those latencies that shows, there's the nerve --

A.  *The writing is so small I can't read it.*

Q.  Oh, okay.  All right.  So it could be there, you just can't read it?

A.  Nerve conduction, there's nerve conductions.

Q.  Uh-huh.

A.  Needles examination.

Q.  Right, we have --

A. This says normal.  I don't see any abnormal spontaneous electrical activity on there.

Q.  Well, then how come the doctor's got --

A.  I can't explain what the doctor is saying.  There is probably some radiculopathy with functionally without really a significant increase in motor latency, I can't say there's a significant impairment with carpal tunnel.

Q.  So but you can't really, you can't really read it to see if there is, right?

A.  I don't see any latencies on that chart, do you?

Q.  Well, I thought that's what that was, Doctor.  I thought that the nerve conduction--

A.  No, the needle examination is not the latency.  It just talks about nerve conduction.

(Tr. 96-98, italics added).

Viewed in context, it is clear to this Court that the only portion of the record that Dr. Newman could not read was a portion of the writing on pages three and five of Plaintiff's EMG test results. However, Dr. Newman's testimony reflects that he did review the charted results, and interpreted those results himself. His testimony reflects disagreement with Plaintiff's attorney's interpretation, as well as with Dr. Lee-Robinson's interpretation of the results to the extent that she found significant functional impairment resulting from carpal tunnel syndrome.

In general, the fact that Dr. Newman professed that he could not make out certain of the words written on the chart in question is not a basis for rejecting all of his testimony,[5] and it was not error for the ALJ to accept Dr. Newman's testimony as a qualified medical expert. Ordinarily, an ALJ may hear testimony from a non-examining medical expert in order to assist him or her in making sense of the record. *Buxton v. Halter*, 246 F.3d 762 (6th Cir. 2001). In this case, the ALJ expressly relied upon and cited Dr. Newman's testimony only in his conclusion that Plaintiff's physical impairments did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, with particular consideration given to Listing 1.02 (major dysfunction of a joint) and Listing 1.04 (disorders of the spine).[6] (Tr. 14). Thus, no error appears in the record based upon either the ALJ's general acceptance and use of Dr. Newman as a medical expert, and Plaintiff does not

---

[5] In fact, this Court also finds a portion of Dr. Robinson's handwriting to be nearly indecipherable on the two referenced pages. (Tr. 597, 599, Exhibit 45F, pages 3 and 5).

[6] The ALJ also determined that Plaintiff did not meet or equal Listing sections 12.02 (organic mental disorders), 12.04 (affective disorders) and 12.08 (personality disorders), but Dr. Newman did not provide testimony concerning those listed mental impairments.

articulate (and this Court cannot locate) any particular error regarding the ALJ's reliance on Dr. Newman's testimony.

**2. Plaintiff's Carpal Tunnel Syndrome and the ALJ's Failure to Find Additional Hand/Elbow Limitations**

Dr. Newman did testify concerning the EMG study, although the extent to which the ALJ may have considered that testimony when calculating Plaintiff's hand/elbow limitations is not expressed in the opinion. In any event, Plaintiff's main argument seems to be that - regardless of the extent to which the ALJ considered Dr. Newman's testimony on this issue - the ALJ erred by failing to ascribe significant functional limitations resulting from Plaintiff's carpal tunnel syndrome. Plaintiff argues that six other medical professionals were able to read the exhibit that Dr. Newman could not decipher. (Doc. 25 at 2). Plaintiff's argument implies that those physicians agreed with Dr. Lee-Robinson in acknowledging Plaintiff's severe carpal tunnel syndrome and/or additional hand/elbow restrictions.

A review of the referenced reports and the medical evidence relating to Plaintiff's alleged carpal tunnel syndrome does not reveal overwhelming evidence of functional impairment. Instead, while sporadic evidence of carpal tunnel syndrome appears in Plaintiff's medical records beginning in 2007 and continuing through 2010, very little of that evidence supports a finding of *any* functional impairment. A mere diagnosis does not reveal the degree or severity of any impairment. *See Young v. Sec'y of Health and Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990). Taken as a whole, the record reveals substantial evidence to support the ALJ's conclusion that Plaintiff's carpal tunnel syndrome did not result in functional limitations other than those found by the ALJ.

The six physicians upon whose records Plaintiff relies are: Dr. Yeh, Dr. Lichota, Dr.

Mirkopoulos, Dr. Lee-Robinson, Dr. Ebel, and Dr. Vitols. A review of the referenced records together with additional records cited by the ALJ proves that substantial evidence supports the ALJ's determination that Plaintiff suffers from no significant functional limitations due to his carpal tunnel syndrome.

For example, on January 27, 2005, Dr. Yeh examined Plaintiff for a complaint of shoulder and neck pain. Dr. Yeh noted that Plaintiff "denies radicular pain or sensory symptoms in both upper limbs, except the tingling sensation of the right hand, which was diagnosed as carpal tunnel syndrome in the past." (Tr. 345). Upon exam, Dr. Yeh found "mostly tendinitis and frozen shoulder on both sides," but with "no clinical signs of cervical radiculopathy in both upper extremities." (*Id.*). In other words, Dr. Yeh's report, which predates the 2009 EMG study by Dr. Lee-Robinson, suggests no functional impairment (as of 2005) from a "past" alleged diagnosis of carpal tunnel syndrome.[7]

No additional records concerning carpal tunnel syndrome appear for the span of two years, but on January 4, 2007 pain specialist Lisa Lichota, D.O. appears to have diagnosed carpal tunnel syndrome. However, just four months later, she "noted only mild asymmetry of the hand muscles and only mild swelling of the hands" on examination. (Tr. 13). Dr. Lichota made similar findings on May 22, 2007.

In concluding that Plaintiff's carpal tunnel syndrome was "non-severe" and did not result in functional limitations of Plaintiff's hands or elbows, the ALJ also pointed to imaging of Plaintiff's right elbow for a trauma injury on April 2, 2007 that was "normal" (Tr. 385), as well as another x-ray of the same elbow after a motor vehicle accident on April 21, 2007.

---

[7] Plaintiff's self-reported "past" diagnosis in 2005 is not supported by any evidence that any physician had made an objective diagnosis of carpal tunnel syndrome prior to that date.

(Tr. 386). Plaintiff reported to an examining emergency room physician at that time that his right elbow had hit a steering wheel during a car accident, and that he had "a history of chronic tendonitis in his right elbow." (*Id*.). The ER physician, Dr. Huerta, reported that Plaintiff complained of tenderness in his elbow but had no swelling and normal range of motion. (Tr. 13, 387-389).

A state reviewing physician, Diane Manos, M.D., opined after her review of the medical evidence in August 2007 that Plaintiff had normal motor and sensory functions in his hand despite his prior report of carpal tunnel syndrome. (Tr. 447-448, 453). William Bolz, MD., affirmed Dr. Mano's assessment in November 2007. (Tr. 493).

On August 13, 2008, Dr. Tigyer similarly reported upon examination that Plaintiff had full range of motion in both elbows, wrists and fingers, with no swelling. (Tr. 550). On January 23, 2009, orthopedist Dr. Trzeciak examined Plaintiff and noted that Plaintiff reported only "occasional" hand numbness.

On January 23, 2009, orthopedist Dr. Marc Trzeciak examined Plaintiff for complaints of right elbow pain, which Plaintiff reported had begun the previous month "while he was doing pushups...[with] increased popping and cracking when he flexes and extends his elbow." (Tr. 569). At the time, Plaintiff reported that he had experienced injuries to his elbow "maybe 15 years ago but has not had any problems since." (*Id.*). Plaintiff also reported that he had occasional numbness in his hand and "may or may not have had carpal tunnel in the past." Dr. Trzeciak described some crepitus and tenderness with reduced range of motion of the right elbow on exam, but found that all nerves were intact, with no tenderness in the medial or lateral epicondyle or in the olecranon, and that Spurling's test was negative. The only diagnosis made by Dr. Trzeciak was "possible" arthritic pain. (Tr.

13

570).

Consistent with Plaintiff's primary complaints of shoulder pain, Dr. Mirkopoulos surgically repaired Plaintiff's rotator cuff tear in September 2009. His records contain a reference to Plaintiff having reported a prior carpal tunnel syndrome diagnosis "about 7 years ago," placing the date around 2002, well before Plaintiff's claimed disability date. (Tr. 591-592, 600-601). Due to the lapse of time, on October 6, 2009, Dr. Mirkopoulos recommended that Plaintiff "get EMG and nerve conduction studies to rule out carpal tunnel bilaterally." (Tr. 601).

Dr. Lee-Robinson performed the follow-up studies recommended by Dr. Mirkopoulos in late October 2009. She found that Plaintiff's EMG studies "do reveal abnormal findings consistent with bilateral carpal tunnel syndrome, ulnar mononeuropathy at the elbows and an overlying cervical radiculopathy," which "correlate well with his reported symptoms." (Tr. 741). Dr. Lee-Robinson diagnosed "carpal tunnel syndrome of moderate/severe degree and right slightly > left." (Tr. 743).

Dr. Lee-Robinson's diagnosis of carpal tunnel syndrome of a moderate/severe degree in October 2009 turns out to be the *only* medical evidence that supports the type of functional impairment claimed by Plaintiff to have existed since November 2006. However, as discussed above, the records of other physicians contradicted any suggestion that Plaintiff suffers from significant elbow/hand restrictions. In addition to the testimony of Dr. Newman that the later EMG study did not support significant functional impairment, there is evidence from Dr. Lichota, Plaintiff's treating pain specialist, that Plaintiff was not significantly limited by his diagnosis of carpal tunnel syndrome. She opined by letter dated February 1, 2010 that Plaintiff had "some *unilateral* hand weakness initially," which "has

14

largely *resolved*." (Tr. 753, emphasis added). While Plaintiff makes reference to the records of Dr. Rose Ebel, his primary care physician, her records also fail to reflect any significant discussion of carpal tunnel syndrome or hand/elbow limitations. In written opinions describing Plaintiff as disabled, she does not rely upon carpal tunnel syndrome but instead on Plaintiff's longer-standing complaints of shoulder/neck and back pain, as well as upon Plaintiff's alleged mental impairments.

Consultative physician Aivars Vitols, D.O. examined Plaintiff on March 4, 2010 and found full flexion and extension of the elbows with no heat, redness, tenderness or instabilities. (Tr. 13). Like Dr. Newman, Dr. Vitols specifically disagreed with Dr. Lee-Robinson's interpretation of the EMG study, concluding that the study showed only moderate carpal tunnel syndrome on the left. While Dr. Vitols found positive Tinel's signs on examination, he also found stable wrists with unrestricted range of motion. (Tr. 757). Thus, although Dr. Vitols suggested that Plaintiff's carpal tunnel syndrome would "affect" his ability to grasp, he also determined that Plaintiff's ability to grasp and manipulate were satisfactory and that his abilities to pinch and grip were intact. (Tr. 13, 758). Dr. Vitols noted that Plaintiff had full functional abilities to use both hands, except that he only "occasionally" could reach or push/pull with his left hand. (Tr. 766). In an Addendum dated March 16, 2010, Dr. Vitols clarified that Plaintiff could "frequently" (over one-third of the time) perform tasks that require "handling" with either hand, and could "continuously" use both hands for fingering and for feeling. (Tr. 772).

Even Plaintiff's own testimony was equivocal concerning any additional limitations. When asked if he was able to use his left arm, hand and fingers, Plaintiff testified in February 2010 that he did not have full range of motion with his shoulder, but that "my

hands work." (Tr. 40). Similarly, in June 2010 he testified that he could use his hands, despite tendonitis in his elbows. (Tr. 52, 79). He testified that he could hold things, but that he could not "hang onto something for very long" due to his carpal tunnel syndrome. (Tr. 51). He admitted that his wrist braces help, but stated that he does not bother to wear them because he does not use his hands very much (Tr. 51-52). He testified he has "tingling" but not pain in his fingers for the past seven years (Tr. 57-58). Plaintiff testified that he can button and zip his clothes without difficulty. The only suggestion of additional limitations was his testimony, in response questioning from his attorney, that he could not perform an activity like buttoning and zipping "all day long" due to the repetitive motion required. (Tr. 90). However, the ALJ rejected the degree of limitations testified to by Plaintiff as not credible.

In assessing Plaintiff's RFC, the ALJ largely adopted the limitations suggested by Dr. Vitols, concluding that Plaintiff can perform handling or gross manipulation no more than frequently, and can push/pull "no more than occasionally on the left and no more than frequently on the right." (Tr. 15). Substantial evidence exists to support the ALJ's findings that Plaintiff's carpal tunnel syndrome did not require additional hand and elbow restrictions. *See generally Longworth v. Comm'r of Soc. Sec.,* 402 F.3d 591, 595 (6th Cir. 2005)("If substantial evidence supports the Commissioner's decision, this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.").

### 3. Failure to Consider Evidence of Back and Shoulder Impairments and/or Additional Limitations Due to Pain

Plaintiff also argues that "[t]he underlying issue that has been overlooked is the fact

that the shoulders are 'severely limited' and the use of my elbows and hands are severely limited as well due to the simple fact that they can't go unrestricted because my shoulders do not allow." (Doc. 18 at 6, spelling and punctuation corrected for readability). In other words, Plaintiff argues that the use of his hands and elbows are limited not merely due to carpal tunnel syndrome, but at least equally if not more so due to his shoulder impairment.

In fact, the majority of Plaintiff's complaints relate to his neck, back and shoulder impairments, and the chronic pain resulting therefrom. Plaintiff has apparently suffered from neck and shoulder issues since sometime in the "mid 1990's" (Tr. 400) and he points specifically to records of his back and shoulder impairment (Tr. 346-348, 384-385, 389, 457, 569, 583-584, 600, 742, 756-758) as evidence "not considered" by the ALJ.[8]

The ALJ in this case is to be commended for taking the additional step of fleshing out the record following Plaintiff's initial *pro se* appearance, by sending Plaintiff for an additional consultative orthopedic examination and holding a second evidentiary hearing to review the additional evidence. It is true that the ALJ's detailed opinion does not discuss each and every page of Plaintiff's voluminous medical records, but the law does not require such a standard. *See Walker v. Sec'y of Health and Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989)(Secretary need not address every piece of evidence in the record). Plaintiff's assertion of error is rejected because this Court's review confirms that the ALJ discussed *all* of the records referenced by Plaintiff, including the image reports located at Tr. 346-348, (*see* Tr. 12), the March and April 2007 image reports located at Tr. 384-385, (*see* Tr. 12-13), the image report located at Tr. 389 (*see* Tr. 13), the April 23, 2007 MRI of Plaintiff's right shoulder located at Tr. 457 (*see* Tr. 12), the January 23, 2009 report located at Tr. 569

---

[8] Several of the referenced records relate to Plaintiff's elbow, but reflect "normal" images.

stating "no pain in the shoulder" (*see* Tr. 13), the July 2008 MRI located at Tr. 583-584 (*see* Tr. 12, 17, 20), the October 2009 opinion of Dr. Mirkopoulos at Tr. 600 (see Tr. 20), the EMG study and opinions of Dr. Lee-Robinson located at Tr. 742 (*see* Tr. 13, 19), and the March 2010 opinions of Dr. Vitols located at Tr. 756-758 (*see* Tr. 20-23).

Based upon a review of Plaintiff's medical records as a whole, the ALJ determined that Plaintiff suffers from "degenerative changes of the cervical and thoracic spines and a lumbar disc protrusion with neck and back pain" as well as "a left rotator cuff tear with chronic left shoulder pain" and a history that includes "pain disorders." (Tr. 11). The ALJ further determined that Plaintiff was physically limited by these conditions to the extent that he could never climb stairs, ropes, ladders or scaffolds, could only occasionally balance, stoop, kneel, crouch, crawl or use foot controls, and can perform no work at all above shoulder level on the left, "although he can do so frequently on the right." (Tr. 15). However, the ALJ rejected Plaintiff's assertions of disabling pain as not credible, because neither objective medical evidence, nor clinical records, nor any other evidence supported that claim.

### a. Chronological Medical Evidence Relevant to Neck/Back/Shoulder

The ALJ noted that three January 2005 images showed only mildly compressive disc protrusions, and other mild degenerative issues. (Tr. 17). Additional MRIs dated 2006, 2007, and 2008 also showed relatively mild conditions, with only one 2007 image showing mild to moderate changes in the thoracic spine. The ALJ pointed out that even Plaintiff's pain specialist, Dr. Lichota, reported in 2007 that Plaintiff's musculoskelatal examination was normal other than findings of moderate to mild muscle spasms in some areas, with moderate crepitation and stiffness of the shoulder muscles and mild loss of motion of the

right shoulder, and mild tenderness of the cervical and thoracic spines.  (Tr. 17).

At examinations conducted by an emergency room physician in February and April of 2007, the cervical and thoracic spine appeared to be normal with either no tenderness or only mild cervical tenderness (only in April after a motor vehicle accident), and full range of motion.  (Tr. 18).

On February 15, 2008, Plaintiff complained to Dr. Lichota of increased thoracic pain but also reported that he had improved physical function.    (Tr. 17).  Although Plaintiff reported moderate to severe pain through November 2009, he subsequently reported 80% relief with use of a TENS unit and reported 95% reduction of pain from injected medicines. (Tr. 17).

Dr. Tigyer examined Plaintiff on August 13, 2008 and found no shoulder abnormalities, and full and "pain free" range of motion of the shoulders.   Similarly, when examined on January 23, 2009, Dr. Trzeciak noted that Plaintiff had no shoulder pain.  In May of 2009, Dr. Lichota implanted a trial spinal cord stimulator.  When subsequently examined by neurosurgeon Jamal Taha, M.D., Plaintiff had a normal gait and his neck, spine, and extremities appeared "unremarkable."  (Tr. 18).   Plaintiff did complain of left shoulder pain on August 25, 2009 after an alleged assault, but the examining physician noted only mild tenderness and "pretty decent" range of motion with only slightly increased pain. (Tr. 19).  Dr. Taha performed a laminectomy and implanted a spinal cord stimulator on September 19, 2009, following which Plaintiff was doing "very well," with reported improvement in his back pain.  (Tr. 18).

After repeated images including multiple MRIs that showed no rotator cuff tear and only the relatively mild back conditions previously noted, on September 9, 2009 Plaintiff had

an MRI that showed tearing of his supraspinatus tendon in his left shoulder, as well as degenerative changes.  Dr. Mirkopoulos surgically repaired the shoulder and a month later, noted that Plaintiff's left shoulder was doing "extremely well" and that he had good range of motion.  (Tr. 20).  On October 27, 2009, Dr. Mirkopoulos saw Plaintiff following repair of his rotator cuff.  Dr. Mirkopoulos noted that Plaintiff had "good range of motion," with a pain level that "feels much better than it has in a few years." (Tr. 600).[9]

Similarly, in March 2010, Dr. Vitols noted left shoulder tenderness and restricted active range of motion, but found full passive range of motion, with no instabilities and no obvious deformities in either shoulder.  (Tr. 20).  Dr. Vitols also stated that Plaintiff had full range of motion of his neck, despite complaints of neck pain. (Tr. 19).

Evidence that Plaintiff suffers from one or more objective conditions expected to cause some pain does not mean that the ALJ must find Plaintiff to be disabled.  Many people experience chronic pain that is less than disabling.  *See Blacha v. Secretary of Health and Human Services*, 927 F.2d 228, 230-231 (6th Cir. 1990)(affirming ALJ's determination that back pain from nerve root compression and herniated disc, coupled with degenerative changes, was not disabling).

### b.  Non-medical Evidence Relating to Pain

In addition to reviewing the objective and clinical medical records relating to Plaintiff's chronic neck/back and shoulder complaints, which he found did not support Plaintiff's complaints of a disabling level of pain, the ALJ considered Plaintiff's testimony and non-medical evidence.  A disability claim can be supported by a claimant's subjective complaints,

---

[9] Curiously, Dr. Mirkopoulos notes that Plaintiff reports that he does painting "[a]t his job."  (Tr. 600).

as long as there is objective medical evidence of the underlying medical condition in the record. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d at 475. However, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Id.* at 476. (citations omitted).

An ALJ's credibility assessment must be supported by substantial evidence, but "an ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997). Further, a credibility determination cannot be disturbed "absent a compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). Thus, it is proper for an ALJ to discount the claimant's testimony where there are contradictions among the medical records, his testimony, and other evidence. *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 392 (6th Cir. 2004).

Plaintiff testified that although he was unable to raise his left arm above shoulder level, he could otherwise use his arms, hands, and fingers. He also reported a fairly extensive list of daily activities. In addition to watching television,[10] he stated on his application that he "tinker[s]" with his car during the day. (Tr. 16, 287-289). Plaintiff reported that he prepares meals, shops for groceries and/or clothes 2-3 times per week for an hour at a time, drives about six times per week, does household chores such as laundry, cleaning, dusting, washing dishes, and household repairs. (*Id.*). He reported in March 2008 that he had been in Houston, Texas (Tr. 21, 694), and testified at the hearing that he attended his father's funeral in Missouri in June of 2008. (Tr. 22). In November 2008 he

---

[10] Plaintiff stated in his disability application that he watches up to 10 hours per day of television. (Tr. 289).

told a physician that he had been taking dancing lessons with his new girlfriend, and that he was dancing the Rumba three to four nights per week. (*Id.*, Tr. 618). The ALJ found that Plaintiff's "performance of such activities on a regular and continuing basis indicates that the claimant's level of pain and depression does not seriously interfere" with his abilities "to maintain attention and concentration, perform routine tasks, understand and follow simple instructions, and interact with others." (Tr. 22).

The ALJ also determined that Plaintiff's credibility was undermined by a number of inconsistent statements concerning his activity level, and his use of marijuana and alcohol. (Tr. 22). The ALJ also noted that Plaintiff's "presentation and demeanor at the hearing was...inconsistent with his allegations of disabling symptoms," noting that Plaintiff "appeared to greatly exaggerate his symptoms." (Tr. 22).[11] I find no error in the ALJ's overall assessment of Plaintiff's credibility, including the ALJ's determination that Plaintiff is not entitled to greater limitations solely on the basis of his pain complaints.

### 4. Failure to Find Additional Mental Impairments

Plaintiff argues that he is disabled partially based upon his mental impairments. (Doc. 18 at 3). The ALJ found that Plaintiff has "a history of mood and pain disorders," (Tr. 11), but concluded that his mental impairments did not meet or equal a listed impairment, because Plaintiff has only mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, concentration, persistence or pace, and no episodes of decompensation. Plaintiff has been prescribed Xanax for anxiety, but has never sought any significant mental health treatment.

---

[11] For example, Plaintiff's testimony concerning his limitations and activity level changed significantly between the first hearing, when he appeared pro se, and the second hearing, when he was represented by counsel.

Plaintiff contends that the ALJ did not adequately consider the report of consulting psychologist, Stephen Fritsch, Psy. D.  However, the record shows that the ALJ gave significant weight to and discussed in detail Dr. Fritcsch's assessment.  Plaintiff reported to Dr. Fritsch that his only prior mental health treatment consisted of a single consultation for a Xanax prescription, although he also stated he had made several emergency room visits in the prior year due to panic attacks.  (Tr. 21).  Dr. Fritsch found Plaintiff to be moderately impaired in the ability to respond to changes in work routine, and markedly impaired in the ability to respond to work pressures, but still able to understand, remember, and carry out short and simple instructions.  (Tr. 15).  Dr. Fritsch opined that Plaintiff would have "mild to moderate degree of difficulty maintaining optimal concentration and persistence in the workplace."  (Tr. 419).  Dr Fritsch also opined that Plaintiff's ability to interact with supervisors is "mildly impaired," and that he is "likely to have some problems responding appropriately to work pressures" with his ability in that area "markedly impaired" and his ability to respond to changes in routine "moderately impaired." Patricia Semmelman, Ph.D., similarly opined that Plaintiff is "unable to carry out complex instructions."  (Tr. 430).  She noted that Plaintiff's social skills were mildly to moderately impaired.  (Tr. 430, 442).  Dr. Semmelmann opined that Plaintiff could work at a steady pace for routine tasks "as long as he is not required to meet a production requirement or to interact with the public."  (*Id.*).  Based in large part on this report, the ALJ determined that Plaintiff was limited to work with "one- or two-step tasks requiring little if any, concentration and no exposure to the general public."  (Tr. 15).

Defendant argues persuasively that the ALJ's assessment of Plaintiff's mental RFC is supported by substantial evidence in the record based upon the opinions of Dr. Fritsch

and Dr. Semmelman, as well as the additional consulting opinions of Drs. Hoyle and Jonas, who opined that Plaintiff would have "mild" impairment in maintaining concentration, persistence or pace. Although Plaintiff's primary care physician opined that Plaintiff had much more severe limitations in relating to people, handling stress, maintaining concentration, and maintaining a schedule, (*see* Tr. 877-879), Dr. Ebel conducted no particular examination or testing in reaching those conclusions. The ALJ's rejection of her mental health restrictions as entitled to "little weight" was not error in this case, to the extent that the ALJ deferred to the wealth of contrary evidence by examining specialist Dr. Fristch and three other consulting mental health experts, as compared to Dr. Ebel's role as "a family physician who is not qualified to offer an opinion on the claimant's level of mental functioning." (Tr. 27). *See Ritchie v. Astrue*, 2011 WL 1235203 at *9 (S.D. Ohio March 11, 2011)(Report and Recommendation opining primary care physician's opinion concerning mental impairments not entitled to controlling weight), *adopted* 2011 WL 1211553 (S.D. Ohio March 29, 2011); *see also* 20 C.F.R. §§416.927(c)(2)(ii); 416.926(c)(5).

Plaintiff additionally argues that the ALJ did not consider his bipolar and anxiety disorders, his ADD, or his depressive disorder, pointing to records that briefly reference the alleged diagnoses, such as the notes of Dr. Ebel and pain specialist, Dr. Lichota (Tr. 777 (Lichota record referencing Plaintiff's "anxiety and bipolar disorder, which he has by history" and "probable" ADD), 881 (Ebel letter stating that Plaintiff "has been diagnosed with Bipolar disorder and anxiety disorder" and "may have Attention Deficit Disorder"), as well as those of neurosurgeon Dr. Taha (Tr. 900, outpatient record listing "depressive disorder, not otherwise classified" under list of secondary diagnoses). Again, however, it was not error for the ALJ to rely upon the opinions and records of the mental health professionals to

24

determine the level of Plaintiff's mental health limitations.

In a similar vein, Plaintiff argues that the ALJ failed to address evidence of "memory loss and confusion," (Doc. 18 at 7), allegedly supported by evidence that he was not compliant with medication instructions and doctor's orders. The ALJ found that Plaintiff's allegations of memory loss and confusion were "not supported by objective medical signs or findings in the record." (Tr. 14). In any event, the ALJ's finding that Plaintiff was limited to simple one or two-step tasks requiring "little, if any, concentration" would appear to encompass any minor limitations in this regard. Plaintiff points to no medical evidence or opinion that would require any greater limitations.[12]

### 5. Failure to Accept Treating Physician's Opinions

In a related argument, Plaintiff complains that the ALJ failed to accept the evaluative letters from three treating physicians that he is permanently disabled; namely, Dr. Ebel, Dr. Lichota, and Dr. Mirkopoulos. (Tr. 758, 777, 877-880). The relevant regulation concerning the opinions of treating physicians, 20 C.F.R. §404.1527(c)(2), provides: "[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight." *Id.*; *see also Warner v. Comm'r of Soc. Sec.,* 375 F.3d 387, 390 (6th Cir. 2004).

The reasoning behind what has become known as "the treating physician rule" has been stated as follows:

_____

[12] This discussion is intended to be limited to a claim that Plaintiff has mental restrictions not caused by medication issues. Additional limitations pertaining to Plaintiff's use of narcotic medications, while potentially related, are discussed in Section C of this Report and Recommendation.

. . . these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

*Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)(quoting 20 C.F.R. § 404.1527(d)(2)). Thus, the treating physician rule requires "the ALJ to generally give greater deference to the opinions of treating physicians than to the opinions of non-treating physicians." *See Blakely v. Commissioner of Social Security*, 581 F.3d 399, 406 (6th Cir. 2009).

Despite the presumptive weight given to the opinions of the treating physician, if those opinions are not "well-supported" or are inconsistent with other substantial evidence, then the opinions need not be given controlling weight. Soc. Sec. Ruling 96-2p, 1996 WL 374188, at *2 (July 2, 1996). In such cases, the ALJ should review additional factors to determine how much weight should be afforded to the opinion. These factors include, but are not limited to: "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." *Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009); *see also* 20 C.F.R. §404.1527(c)(2). "[A] finding that a treating source medical opinion...is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley*, 581 F.3d at 408 (quoting Soc. Sec. Rul. 96-2p).

When the treating physician's opinion is not given controlling weight, the ALJ must provide "good reasons" for doing so. *Id.*; 20 C.F.R. §404.1527(c)(2). Good reasons "must

be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Blakley*, 581 F.3d at 406-407; *see also* Soc. Sec. Rul. 96-2p.

Of course, not every opinion uttered by a treating physician is entitled to the same weight. Both the determination of a claimant's RFC and the ultimate determination of disability are "reserved to the Commissioner." 20 C.F.R. §404.1527(d). Where conclusions regarding a claimant's functional capacity are not substantiated by objective evidence, the ALJ is not required to credit those conclusions. *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 287 (6ᵗʰ Cir. 1994).

Dr. Ebel, Plaintiff's primary care physician, completed a Disability Pension Examination Report for the benefit of the Iron Workers District Pension Trust on May 11, 2007 and again on January 28, 2008. In both reports, she opined that Plaintiff was totally and permanently disabled due to his back, neck and shoulder pain as well as his anxiety and PTSD. (Tr. 22, 400, 861-862). Dr. Ebel completed an additional Medical Questionnaire on June 28, 2007 wherein she opined that Plaintiff had decreased range of motion of his cervical and lumbar spines, and of his shoulders bilaterally. (Tr. 497). She opined that Plaintiff was unable to work with his arms raised above 90 degrees, and that he was unable to do "heavy" lifting or bending, but she also stated that Plaintiff had no radicular symptoms other than pain, and that he was able to walk with a normal gait and without aids. (Tr. 23, 497, 881). In a letter dated June 10, 2010, Dr. Ebel states that "Tim is unable to return to his previous employment," and "is not a good candidate for job re-training for a more sedentary job due to his psychological limitations." (Tr. 881). However, the same letter

states that although Plaintiff has difficulty understanding "complex directions," "he can usually manage simple tasks." (*Id.*).

The ALJ rejected Dr. Ebel's opinion as "not entitled to controlling or deferential weight" in this case, notwithstanding her role as Plaintiff's treating physician. The ALJ explained in part:

> The undersigned gives little weight to her assessments, because they are unsupported by objective findings in her treatment notes dated after the alleged disability onset date (see, for example, Exhibit 32F, pages 29-32). Moreover, the claimant told Dr. Gardner on November 12, 2009, that Dr. Ebel had told him that it was "okay" for him to work...and such a statement is inconsistent with her statements in the Disability Pension Examination Reports that the claimant was "totally and permanently disabled."...The undersigned also notes that Dr. Ebel's June 2007 [assessment] that...the claimant is unable to do 'heavy' lifting and is restricted regarding the use of his arms is not materially inconsistent with the physical restrictions in the residual functional capacity above [found by the ALJ].

(Tr. 24). The ALJ also rejected Dr. Ebel's findings of extreme psychological limitations because those opinions were not supported by medically acceptable diagnostic techniques, were inconsistent with virtually all opinions by multiple mental health professionals as well as Plaintiff's mental health treatment history and activities of daily living, and because Dr. Ebel is a family physician not particularly qualified to evaluate Plaintiff's mental limitations. (Tr. 27). I find no error in the ALJ's rejection of Dr. Ebel's opinions, which was based upon clearly articulated "good reasons."

The ALJ also rejected as "not entitled to controlling or deferential weight" and gave only "little weight" to the assessment of Dr. Mirkopoulos, after finding that assessment was "unsupported by objective signs and findings." (Tr. 24). The ALJ noted that Dr. Mirkopoulos had treated Plaintiff only for his left shoulder rotator cuff tear, and that just one month prior to providing an assessment in which he essentially opined that Plaintiff had severe and

disabling limitations, Dr. Mirkopoulos had stated that Plaintiff was doing "extremely well" with good range of motion in his shoulder.  In his assessment, Dr. Mirkopoulos expressly notes that he is "not taking care of [Plaintiff's] back," and that Plaintiff's pain specialist would be better able to assess some of Plaintiff's limitations.  Although Dr. Mirkopoulos does not directly opine that Plaintiff is disabled, he states in a treatment record dated October 2009 that Plaintiff should "find a lawyer" and "consider possibly [applying for] social security disability."  (Tr. 600).  Again, the ALJ's basis for rejecting portions of Dr. Mirkopoulos's opinions finds ample support in the record.

The third treating physician whose opinion the ALJ discounted was Plaintiff's pain specialist, Dr. Lichota.  The ALJ discounted Dr. Lichota's opinion to the extent that she stated: "I do not believe that [Plaintiff] is ever likely to return to gainful employment in any fashion" due in part to Plaintiff's combination of physical and mental problems, including anxiety and bipolar disorder.  (Tr. 753, 777).  The ALJ also rejected her opinions concerning Plaintiff's postural limitations.  The ALJ found that Dr. Lichota's opinions were not entitled to controlling or deferential weight, despite her status as a treating physician, because her opinions were "not supported by objective signs and findings upon examination."  (Tr. 25). The ALJ pointed out that "Dr. Lichota consistently reported only mild cervical and thoracic spinal tenderness and stiffness, and she noted otherwise normal musculoskelatal examinations."  (Tr. 25).  Plaintiff also reported to Dr. Lichota that he was "receiving significant benefit from the TENS unit and SI joint injections."  (*Id.*).  On April 2, 2009, Dr. Lichota described Plaintiff's condition as "stable" on his medications, which in combination with the other referenced evidence in Dr. Lichota's notes, the ALJ found to be "inconsistent with a finding of disability."  (Tr. 25).  The ALJ noted that part of Dr. Lichota's ultimate

determination that Plaintiff could not return to full-time employment appeared to be based in significant part on Plaintiff's depression, which, like the opinion of Dr. Ebel, the ALJ was entitled to reject on grounds that it was not based on medically acceptable evidence, was contradicted by a large body of contrary evidence from mental health experts, and because Dr. Lichota was "unqualified to offer an opinion" on the degree of Plaintiff's mental impairment. With the exception of a related issue (discussed below) concerning Plaintiff's postural limitations, I find no error in the ALJ's analysis.

In one sentence in his Statement of Errors (Doc. 18 at 7), Plaintiff also briefly criticizes the ALJ's use of Dr. Vitols' opinion, which the ALJ relied upon and gave "significant weight." (Tr. 23). The Plaintiff cites Tr. 758 as evidence in his favor. While nearly all of the limitations noted on page 758 of Dr. Vitols' opinion were adopted by the ALJ, this Court finds two critical areas in which the ALJ's rejection (rather than adoption) of Dr. Vitols' opinion is not supported by substantial evidence and requires remand. These errors, which concern the ALJ's rejection of Dr. Vitols' opinion concerning Plaintiff's postural limitations and failure to include a restriction on work with moving machinery, is discussed below in Section C of this Report and Recommendation. However, for purposes of the error more specifically identified by Plaintiff - acceptance of most of Dr. Vitols' opinions in place of the  more severe restrictions offered by Plaintiff's treating physicians, I find no error. For the reasons discussed above in the section concerning Plaintiff's back/neck and shoulder limitations, substantial evidence supports the ALJ's adoption of most of Dr. Vitols' opinions.

### 6. Failure to Find a Listed impairment

Plaintiff asserts that "steps 1 one [sic] thru 4 four [sic] have been met and the determination should be disabled." The Court construes this as a brief argument that the

ALJ erred by failing to find that Plaintiff met or equaled a Listed Impairment. To the extent that this argument concerns the testimony of Dr. Newman, the discussion above will not be repeated. However, in an "Answer" to Defendant's Memorandum in Opposition, construed by this Court as a reply memorandum in support of his Statement of Errors (Doc. 24), Plaintiff also refers to additional medical conditions, including heart palpitations (Tr. 833), scar tissue in his intestines (Tr. 367), and spurring in his left knee (Tr. 389).[13] Plaintiff also invites this Court to review his criminal history as evidence of chronic "anger management issues," (Doc. 24 at 5) and argues that the ALJ erroneously believes Plaintiff to be an alcoholic and a drug addict. (Doc. 24 at 5).

The ALJ did not specifically discuss any of the referenced medical conditions that Plaintiff suggests should have resulted in a disability finding, although he did reference Plaintiff's inconsistent testimony concerning his marijuana and alcohol abuse in assessing Plaintiff's credibility. I find no error in the ALJ's failure to discuss Plaintiff's alleged heart palpitations, intestinal scar tissue, or spurring (in the elbow), because there is no legal requirement for an ALJ to discuss every medical record, and there is no evidence that any of the referenced conditions resulted in any additional functional limitation.

Plaintiff also states that he "cannot take this life of misery much longer," and asks the Court to find him totally disabled or "put me to sleep like an animal." (Doc. 24 at 5). In a "Request to Expedite" filed on April 10, 2012, Plaintiff states that he was recently hospitalized for attempted suicide, as well as for a swollen testicle, and represents that he

---

[13] The referenced record actually refers to "mild spurring" of a portion of Plaintiff's right elbow, not his knee.

is now homeless.[14]   (Doc. 31).

The Court is not without sympathy for the complaints of this plaintiff and for the hundreds of social security disability applicants who appear before this Court every year. The Court strongly urges Plaintiff to continue to seek out appropriate physical and mental health care at his nearest low-cost or free clinic to the extent that he obviously requires continuing treatment for his maladies.[15]   However, sympathy for a litigant's predicament cannot alter this Court's obligation to apply the law.   Remand in this case is recommended for the reasons discussed in Section C of this opinion, but the Court finds no cause for an immediate award of benefits.

### 7.  Sentence Six Remand

Plaintiff also asks this Court to consider evidence not submitted before the ALJ or the Appeals Council.  Pursuant to Sentence Six, a court can remand for consideration of new evidence only if the plaintiff establishes that the evidence is both new, in that it was "not in existence or available to the claimant at the time of the administrative proceeding" and "material," meaning there is "a reasonable probability that the Secretary would have reached a different disposition."   *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001) (citations omitted); *see also Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006).  The plaintiff must also establish good cause for his failure to present the evidence to the ALJ. *See Bass v. McMahon,* 499 F.3d 506 (6th Cir. 2007); *Brainard v. Sec'y of Health & Human*

---

[14] At the time he was evaluated by Dr. Fritsch in June 28, 2007, Plaintiff lived with his then-23-year-old son in an apartment in Lebanon, Ohio.  At his hearings in February and June 2010, Plaintiff lived with a female friend and her 18-year-old son.  (Tr. 44, 76).

[15] Plaintiff represents in his April 10, 2012 motion that he continues to see a psychiatrist "every two weeks" despite his dire financial situation and homelessness.  (Doc. 31 at 1-2).

*Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). "'Good cause' is not established solely because the new evidence was not generated until after the ALJ's decision. The Sixth Circuit has taken a 'harder line.'" *Saunders v. Comm'r of Soc. Sec.*, 2010 WL 1132286 at *3 (W.D. Mich. March 3, 2010)(*quoting Oliver v. Sec. of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir. 1986)(additional citations omitted).

In this case, Plaintiff asks this Court to consider: (1) a letter dated May 20, 2011 from the Office of Disability Adjudication and Review, to Congressional Representative Jean Schmidt, explaining that the Appeals Council affirmed the ALJ's disability determination (Doc. 18 at 14); and (2) a one-page "work activity abilities assessment" dated 10/13/11 on a form generated by the Warren County Department of Human Services from a "new doctor" by the name of Madhu Kosaraju, M.D. (Doc. 18 at 12).[16]

The first of the two documents - the letter explaining that Plaintiff's appeal was denied by the Appeals Council - is neither legally relevant nor material to disposition of Plaintiff's disability claim.

The second document -the new assessment by Dr. Kosaraju - is at least arguably relevant, but there is some question as to whether it is "material" in the sense that it would change the outcome of this case if considered on remand. Evidence is "material" for purposes of sentence six only if there is a reasonable probability that it could change the decision of the ALJ. *Sizemore v. Secretary of Heatlh and Human Servs.*, 865 F.2d 709, 711 (6th Cir. 1988).

Dr. Kosaraju opines that Plaintiff's *current* limitations (as of 10/13/11) would permit

---

[16]Plaintiff represents that Dr. Kosaraju is a physician (specialty unknown). The form signed by Dr. Kosaraju bears his or her signature under the apace labeled "Physician/Psychiatrist/Psychologist Signature."

him to participate in classroom work and skills training within health-related limitations, but also opines that Plaintiff's limitations are "severe enough to be unable to work and apply for Social Security Disability." (Doc. 18 at 12). The one-page check-box form completed by Dr. Kosaraju indicates "limited" prognosis for sitting and operating office equipment, and "extremely limited" for standing and light lifting (described as 25 pounds or less). However, the space provided to state the "# of weekly hours" is left blank for all activities. The remaining activity boxes are checked "none" under prognosis, which appears to indicate that Plaintiff is not at all limited in those areas, including "typing, completing paperwork, folding papers, alphabetizing, stuffing envelopes, interaction with the general public, follow and carry out instructions, accept and respond appropriately to feedback, and maintain socially appropriate behavior." (*Id*.). In the "Comments" section, Dr. Kosaraju states that Plaintiff "has severe back pain, used to see pain clinic up until recently. Cannot sit or stand for more than 10-15 min. due to pain." (*Id*.).

Dr. Kosaraju's form does not warrant remand under sentence six for a number of reasons. First, the Court does not know anything about Dr. Kosaraju's relationship with Plaintiff (whether a treating doctor, and if so, for how long and of what specialty). Dr. Kosaraju's cursory "disability" opinion also is wholly unsupported by any reference to any type of clinical or objective medical evidence. Last but not least, the opinion is dated more than a year after the ALJ's decision, and does not necessarily pertain to Plaintiff's limitations from 2006-2010. While remand under sentence six is not recommended, because the evidence may be relevant and remand under sentence four is recommended for the reasons discussed below, the Commissioner may in its discretion review the additional evidence when it conducts further fact-finding under sentence four.

Finally, Plaintiff refers to, but does not attach to the record, "new C-T scans from November 11 [presumably 2011] that indicate the cervical spine and lumbar spine have worsened." (Doc. 18 at 9). As with Dr. Kosaraju's opinion, new imaging studies may be relevant and material to a *new* claim for disability. However, aside from the difficulty of evaluating the quality of evidence that has not been tendered to this Court, imaging studies conducted in November of 2011 would not necessarily prove that Plaintiff was disabled due to spine impairments beginning in November of 2006 through the ALJ's decision in 2010. To the contrary, the ALJ reviewed a relatively large body of MRIs and xrays of Plaintiff's spine, as well as numerous physician reports and clinical records, prior to concluding that for the relevant 2006-2010 time frame, Plaintiff did not suffer from a disabling spine impairment. As with Dr. Kosaraju's opinion, the Commissioner may, but is not legally required to, review the additional evidence in the course of further fact-finding under the remand recommended under sentence four. If the Commissioner chooses not to review this particular evidence and Plaintiff believes his condition has worsened, he is free to submit a new application for benefits. *See, e.g.*, *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 685 (6th Cir. 1992). Disability insurance benefits can be made retroactive for a 12 month period before the date of the application for such benefits, so if Plaintiff's condition has in fact worsened, he can obtain some retroactive relief through a new application.

## C. Remand Under Sentence Four Required- Vocational Expert Testimony

Despite rejecting most of Plaintiff's assertions of error under sentence four, and determining that Plaintiff has failed to show that remand under sentence six is required, I find cause for remand based upon one of Plaintiff's last assertions of error. Specifically, Plaintiff challenges the ALJ's reliance upon the testimony of the vocational expert ("VE"),

arguing that the ALJ erred by failing to include additional limitations in the hypothetical posed to the VE. While most of Plaintiff's suggestions for additional limitations are unsupported, one has merit. In addition, in the course of reviewing Plaintiff's claims as a whole, the Court discovered additional limitations that the ALJ should have at least discussed, if not included, in the description of Plaintiff's RFC provided to the vocational expert. These errors are significant enough to warrant remand.

### 1. Additional Weight Restrictions

Plaintiff first contends that the ALJ erroneously found that 4,000 jobs existed that Plaintiff could perform, rather than the much smaller number (800) to which the vocational expert testified. However, the record reflects that the 800 jobs to which the VE testified was only in response to questioning from Plaintiff's counsel at the second evidentiary hearing as to the number of jobs available if Plaintiff could lift any amount of weight only occasionally. (Tr. 112-113). No such limitation was adopted by the ALJ as part of Plaintiff's RFC, nor was any such limitation supported by the record as a whole. A hypothetical question to a vocational expert need only include limitations that are supported by the evidence. *See Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). Therefore, the ALJ did not err in failing to include a weight restriction.

### 2. Additional Limitations Based Upon Pain Medications

Plaintiff comes closer to the mark with his argument that his use of prescription pain medications, including methadone, prohibit the operation of heavy machinery, including potentially some number of jobs that the VE testified that Plaintiff could perform. (Doc. 24 at 3). Plaintiff testified that his medications cause drowsiness and difficulty focusing. Dr. Ebel also opined in 2007 that Plaintiff has "memory loss and poor concentration" in part as

a side effect from the morphine he was then being prescribed. (Tr. 495). On June 7, 2010 she again noted that Plaintiff's medications cause some level of "sedation, memory loss, [and] confusion" as well as "short term memory loss and lack of concentration." (Tr. 880-881).

It is unclear to what extent the limitations offered by Dr. Vitols, upon whose opinions the ALJ primarily relied, were based upon Plaintiff's need for narcotic medications. However, Dr. Vitols did opine that Plaintiff could "only occasionally" tolerate exposure to moving mechanical parts. (Tr. 768). The ALJ neither incorporated this particular limitation nor discussed his reasoning for excluding it. Many of the jobs to which the vocational expert testified would appear to involve exposure to moving mechanical parts, including: small parts assembler, automatic grinding machine operator, final assembler, and clip loading machine loader.

The ALJ incorporated a "lack of concentration" as one facet of Plaintiff's mental impairments, and specifically limited Plaintiff to "simple, one- or two-step tasks requiring little, if any, concentration and no exposure to the general public. (Tr. 15). Given Plaintiff's use of narcotics and the ALJ's failure to discuss Dr. Vitol's potentially related opinion that Plaintiff can only occasionally work with moving mechanical parts, remand is required for further factual development of this issue.

### 3. Postural Limitations and Absenteeism

In attempting to fairly construe and decipher Plaintiff's *pro se* Statement of Errors, this Court has carefully reviewed the entire record of this case and the ALJ's decision. *See, generally, Angel v. Comm'r of Soc. Sec.*, Civil Case No. 1:06-cv-857, 2008 WL 2795803 * 13 (S.D. Ohio July 16, 2008)(Spiegel, J.). During that review, the Court discovered two

additional errors significant enough that remand for further fact-finding is recommended, despite the fact that Plaintiff's *pro se* Statement of Errors arguably fails to specifically identify them. *See generally Troth v. Commissioner of Social Sec.*, No. 3:11-cv-272, 2012 WL 1185999, at *2 (S.D. Ohio April 9, 2012) (Black, J.) ("Because Plaintiff is proceeding pro se, the Court has carefully reviewed the ALJ's decision to determine whether his critical findings of fact were made in compliance with the applicable law and whether substantial evidence supports those findings."). Those errors are: 1) the ALJ's assessment of Plaintiff's postural limitations; and 2) the ALJ's failure to determine Plaintiff's rate of absenteeism.

Plaintiff specifically criticized the ALJ's reliance on Dr. Vitols' opinions, but it is his rejection of select portions of Dr. Vitols' opinion that this Court finds more troubling. In addition to ignoring Dr. Vitol's opinion restricting Plaintiff's work with moving mechanical parts, the ALJ differed with Dr. Vitols concerning Plaintiff's postural limitations, and Dr. Vitols' opinions concerning time restrictions on Plaintiff's abilities to sit, stand and walk. The ALJ explained that he determined a different postural limitations based upon the objective evidence of relatively mild objective impairments and the record as a whole, and that he rejected that portion of Dr. Vitols' opinion on grounds that it was partially based upon Plaintiff's subjective complaints and "not completely support[ed]" by objective evidence. (Tr. 23). However, the ALJ did not explain the medical basis for the postural limitations that he provided to the vocational expert as part of Plaintiff's RFC. Given the ALJ's heavy reliance on Dr. Vitols' medical opinions in every other respect, his selective rejection of Dr. Vitols' postural limitations and substitution of different postural limitations (that do not appear supported by the record) warrants remand.

While the ultimate determination of a claimant's RFC is left to the Commissioner, that

determination can only be upheld if it is based upon substantial evidence in the record. In this case, Plaintiff's treating physicians opined that Plaintiff would be unable to perform any work based upon a multitude of physical limitations and pain complaints, which limitations included postural restrictions. (*See, e.g.*, Tr. 748, opining that Plaintiff can stand and walk not more than 2 hours total during an 8 hour day; Tr. 751, opining that Plaintiff can sit without interruption not more than 20-30 minutes; Tr 875-876, severe postural limitations). Dr. Vitols, upon whose medical opinions the ALJ most heavily relied, disagreed overall with the severity of the physical limitations assessed by Plaintiff's treating physicians, yet still found that Plaintiff would be unable to sit, stand, or walk for more than 1 hour at a time, and that he could only stand for a *total* of 2 hours per day, that he walk not more than the same period (two hours total), and that he could sit for no more than 4 hours per day. (Tr. 765). While the "total" hours of sitting, standing and walking when added together amount to 8 hours, the additional restrictions that Plaintiff can spend no more than 1 hour at a time in any of these activities makes it more difficult to find work that Plaintiff could perform. Rather than adopt these fairly restrictive postural limitations, the ALJ determined that Plaintiff could "stand and/or walk no more than four hours in an eight-hour workday" with no hourly restrictions at all, and no limitations on sitting. (Tr. 15). No treating, examining, or consulting physician appears to have agreed with the ALJ in this respect and the ALJ offered no real explanation for the restrictions he determined. Because even the chief medical consultant relied upon by the ALJ opined that Plaintiff had greater postural restrictions, the RFC as presented to the vocational expert was not supported by substantial evidence.

In addition to the issue of postural limitations, the ALJ should further review and

discuss the rate of Plaintiff's likely absenteeism.  Dr. Lichota opined that Plaintiff had "unpredictable flare-ups of pain" which "would cause frequent absences from work."  (Tr. 777).  Both Dr. Lichota and Dr. Mirkopolis opined that Plaintiff would miss 4 days per month from work due to his impairments.  (See Tr. 749).  While the ALJ briefly referenced Dr. Lichota's opinion concerning Plaintiff's rate of absenteeism (Tr. 25), he failed to reference Dr. Mirkopolis's identical opinion, and failed to determine what Plaintiff's actual rate of absenteeism would be, or whether that rate would impact Plaintiff's ability to maintain employment.

### III.  Conclusion and Recommendation

Based upon the errors concerning the formulation of Plaintiff's RFC and hypothetical provided to the vocational expert, I find that the ALJ's non-disability determination is not supported by substantial evidence in the record presented.  Therefore, **IT IS RECOMMENDED THAT**:

1.  Plaintiff's motion for contempt, request for audio-visual record, and request for addendum (Docs. 19, 25, 26) be **DENIED**;

2.  Plaintiff's motion to expedite (Doc. 31) be **GRANTED** and satisfied by this Report and Recommendation; and

3. Defendant's decision be found **NOT TO BE SUPPORTED BY SUBSTANTIAL EVIDENCE**, **REVERSED,** and **REMANDED** for additional review under Sentence Four, for the reasons discussed in Section II. C. of this Report and Recommendation.

4.  This case be **CLOSED.**

 _/s Stephanie K. Bowman_
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

TIMOTHY J. ESTES,                                    Case No. 1:11-cv-496

        Plaintiff,                                    Dlott, J.

                                            Bowman, M.J.

    v.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

### NOTICE

Pursuant to Fed. R. Civ. P 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN (14) DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).